Joseph M. Gwinn, Jr. v. Commissioner. Mildred C. Gwinn v. Commissioner.
Gwinn v. Commissioner
Docket Nos. 25042, 25043, 25044, 25045. *
United States Tax Court
1951 Tax Ct. Memo LEXIS 9; 10 T.C.M. (CCH) 1224; T.C.M. (RIA) 51344; December 26, 1951
*9 Edward L. Weber, Esq., 800 National Bank Bldg., Detroit 26, Mich., for the petitioners. Norment Custis, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: These proceedings, consolidated for hearing, involve corrected asserted deficiencies in income tax for the taxable year 1943 in the amounts of $3,632.43 and $3,746.42 against Joseph M. Gwinn, Jr., and Mildred C. Gwinn, respectively, of which the respective amounts of $772.29 and $786.35 are in controversy. The only question for our determination is whether the petitioners were entitled to take deductions on their tax returns for the years 1942 and 1943 for advances made to a corporation during the years 1935 through 1938. The year 1942 is involved because of the Current Tax Payment Act of 1943. Findings of Fact Joseph M. Gwinn, Jr., and Mildred C. Gwinn are husband and wife who resided in San Diego, California, during the taxable years 1942 and 1943. Separate individual Federal income tax returns were filed by the petitioners on a community property basis for the taxable years with the collector of internal revenue, Los Angeles, California. Joseph M. Gwinn, Jr., will sometimes *10 hereinafter be referred to as petitioner. In 1935 petitioner organized the Gwinn Aircar Company, a New York corporation, which will sometimes hereinafter be referred to as Aircar. Aircar was organized to design, develop, manufacture and market a new type of airplane. Petitioner was an officer and stockholder of Aircar. Aircar issued 550 shares of its capital stock with a stated value of $55,000 for patent rights and 30 shares with a stated value of $3,000 for cash to petitioner. One hundred and seven shares of a stated value of $21,400 were issued to others than petitioner for services, and 212 shares with a stated value of $39,200.34 were issued to others than petitioner for cash. Aircar borrowed money for its working capital, most of which was borrowed from petitioner and his wife. Petitioner had an agreement with Aircar, dated August 27, 1937, which acknowledged receipt on September 25, 1935 of $650 in consideration of an advance which had been made to Aircar by petitioner and provided that petitioner be paid upon demand the said $650 plus other sums as might be thereafter advanced with interest at 6 per cent, or that he receive certificates of stock at the declared value of *11 $100 per share equal to the money advanced. In the years 1935 through October 29, 1938 petitioner drew checks in varying amounts ranging from $50 to $2,500 payable to Aircar. The total amount of checks drawn by petitioner to Aircar representing loans and the repayments made by Aircar to petitioner were as follows: Amount of checks drawn
Amount of repayments made
Years
by petitioner to Aircar
by Aircar to petitioner
1935
$ 3,250
1936
26,850
$ 800
1937
24,600
16,000
1938
13,725
Petitioner and his wife took bad debt deductions on their Federal income tax returns for the years 1940 through 1943 as follows: 1940
Joint return filed. Total deducted:
$5,250.00
1941
Separate returns (community property basis): Total loans
$25,850.00
Less: Recoveries
12,675.00
Balance unpaid
$13,175.00
1/2 deducted on each return
6,587.50
1942
Separate returns (community property basis): Total loans
$18,800.00
Less: Recoveries
3,325.00
Balance unpaid
$15,475.00
1/2 deducted on each return
7,737.50
1943
Separate returns (community property basis): Total loans
$13,775.00
Less: Recoveries
Balance unpaid
$13,775.00
1/2 deducted on each return
6,887.50
*12 The amounts referred to as recoveries in the above schedule were part of the repayments made by Aircar to petitioner in the years 1936 and 1937. The total deductions for bad debts taken by petitioner and his wife in the years 1940 through 1943 was $47,675. The bad debt deductions claimed by petitioner and his wife in their Federal income tax returns for the years 1940 to 1943, inclusive, were taken in the belief that under the loan agreement the moneys advanced were due five years from the date of the advance. Certain features of the aircraft which Aircar planned to manufacture were covered by patents. There had been an interference action in the patent office between petitioner and another inventor over the basic concept of the tricycle landing gear airplane with two controls which Aircar intended to use. Petitioner and one Fred E. Weick, the other party to the interference action, made an agreement, together with their respective companies, Aircar and Fred E. Weick & Associates, Inc., giving Aircar an exclusive right to manufacture, sell, use and sub-license others to use the patent upon payment of certain royalties. Sometime before 1938 Aircar manufactured two airplanes for *13 experimental purposes. None were manufactured for sale to the public. A demonstration flight was made in Buffalo during 1938 for the purpose of raising more capital. During the demonstration flight, one of the planes built by Aircar flew into some power line wires, fell to the ground, caught fire and burned, killing the two occupants. After this accident Aircar discontinued manufacturing planes, and gradually disbanded. Petitioner sought other employment and in 1940 moved to San Diego, where he was out of touch with the other members of the organization. In 1940 Aircar granted a sub-license to the General Aircraft Corporation, hereinafter sometimes called General Aircraft, to manufacture and to sub-license others to manufacture under the Aircar-Weick patents. The agreement dated October 31, 1940 provided that General Aircraft pay certain royalties to Aircar ranging from $5 to $220 per airplane manufactured, depending upon the weight and quantity of airplanes manufactured. Aircar received a $2,500 advance payment for the license and an additional $2,500 was paid by General Aircraft to Weick for his patents. The $2,500 received by Aircar under the license agreement was deposited in *14 a bank account in Buffalo under the custody of a law firm of that city and was used in the years 1941 to 1943 to pay various debts and expenses of Aircar. The law firm made a disbursement from the bank account as late as October 17, 1947 to reimburse petitioner for legal fees he had paid personally in the amount of $314.37. General Aircraft undertook the production of 50 airplanes in late 1941. Thirty planes of a type known as the Skyfarer were for all practical purposes completed and ten were actually assembled and sold. After 1941 no further planes for civilian use were manufactured by General Aircraft because of the war. General Aircraft also granted sub-licenses to two other corporations, Grand Rapids Industries and Mars Aircraft Corporation. General Aircraft Corporation continued its engineering activities in the small type airplane field during the war period. It resumed efforts to manufacture planes in 1945 and abandoned such efforts in 1946. Although quarterly reports from General Aircraft to Fred E. Weick were required, none were filed until 1946. The agreement with General Aircraft was obtained through Fred E. Weick. Efforts made by petitioner to sub-license others in *15 the early part of the war were unsuccessful. In 1937 the stated value of the Aircar stock was $200 per share. In 1941 petitioner sold some stock to a business associate for $10 a share which he had originally obtained from the company at $100 a share. He subsequently repurchased it at $10 a share. In the years 1940 through 1943 the future of privately owned airplanes was extremely uncertain. The manufacture of such airplanes was prohibited during the war and the probable duration of the war was unknown. On December 31, 1941 the assets of Aircar were only its right under the patent agreement with Weick & Associates, the sub-license of the rights thereunder to General Aircraft and two bank accounts. There was only approximately $20 in one of the bank accounts. The $2,500 from General Aircraft was deposited in the other bank account. Disbursements between January 24, 1941 and December 31, 1941 totaled $1,265.75, and totaled $1,972.65 on October 17, 1947, there being disbursements of $706.90 after December 31, 1941. On that date it owed various small trade liabilities, attorneys' fees and back rent. Petitioner tried to meet some of these obligations from his own personal funds. Other *16 than the initial $2,500 payment Aircar never received any payments under the sub-licensing agreement with General Aircraft. On December 31, 1941 the liabilities of General Aircraft "other than intangible patent value" were in excess of its assets and were chiefly represented by notes payable to the principal financier of the company. The capitalized value of its equipment was set off by a note. Aircar terminated its legal existence in 1947. Petitioner stated in a schedule attached to his individual income tax returns for the years 1942 and 1943 that: "Because the war has directed all interest away from private owner aircraft toward military aircraft, the income from Gwinn Aircar Company from patent royalties has stopped, and the Gwinn Aircar Company has therefore been unable to make any further payments on these loans. "The Gwinn Aircar Company's sole assets comprise these patents, and their value is determined solely by the income which they can produce." Petitioner had no knowledge of the net worth of General Aircraft on December 31, 1941. Opinion The question here is whether the petitioners, Joseph M. Gwinn, Jr., and wife, are entitled to deductions from income in *17 the years 1942 and 1943 on the ground of debts arising from advancements to Aircar in previous years, becoming worthless under section 23 (k) (4) of the Internal Revenue Code. The taxable year is 1943 but the year 1942 is involved because of the Current Tax Payment Act of 1943. Petitioners concede as to 1943 that the debts were "non-business" debts within section 23 (k) (4). The petitioners recognize that they must show that the debts became worthless within the taxable years, but contend that they did so. The respondent contends that the petitioners have failed so to show and specifically argues that they have failed to show that the debts had any value after December 31, 1941. After study of the evidence before us we have concluded that the respondent's position should be sustained. We find no proof that Aircar's obligations had any value after December 31, 1941. At that date Aircar's assets consisted of a sub-license to General Aircraft Corporation, to manufacture under the Aircar-Weick patents, and two bank accounts; one of them contained about $20. In the other there had been deposited $2,500 advance royalties paid by General Aircraft Corporation about *18 October 31, 1940. The evidence before us fails to show the condition of this bank account on December 31, 1941, except that there was placed in evidence "a schedule of disbursements" therefrom starting with a check on January 24, 1941, such disbursements totaling $1,972.65, including disbursements beginning with the check on January 24, 1941, totaling $1,265.75. Whether there had been disbursements prior to the check on January 24, 1941, the to the check on January 24, 1941, the record does not show, but if the $1,972.65 represents the balance of the $2,500 then Aircar's account on December 31, 1941 contained $706.90. The evidence is that it had liabilities on December 31, 1941, consisting of various small trade liabilities, including back rent and a patent attorney's bill. The total amount of these liabilities is not shown and the petitioner Joseph M. Gwinn, Jr., testified that he "couldn't say exactly what the status was at that date." In short, we are not informed by the evidence as to whether Aircar's liabilities exceeded its cash. As to the only other asset, the sub-license to manufacture under the patents, we also have no evidence as to value at that date, except that the petitioner *19 Joseph M. Gwinn, Jr., had stated on his income tax returns for 1942 and 1943 as follows: "The Gwinn Aircar Company's sole assets comprise these patents, and their value is determined solely by the income which they can produce." and the fact that under the evidence they never at any time after December 31, 1941 produced income. In the same schedule he stated that: "Because the war has directed all interest away from private owner aircraft toward military aircraft, the income from Gwinn Aircar Company from patent royalties has stopped * * *." We have also before us the fact that the petitioner Joseph M. Gwinn, Jr., testified that he did not know the value of General Aircraft Corporation (licensee under the sub-license above referred to) on December 31, 1941. On that date, however, its liabilities were in excess of its assets other than intangible patent value. The capitalized value of the equipment was set off by a note. It is obvious, we think, from all of the above, that it is impossible for us to find whether on December 31, 1941, the indebtedness to the petitioners from Aircar had any value. We conclude that the record does not show the value of such obligations on that *20 date. It follows that the petitioners have failed to show that the debts became worthless either during 1942 or during 1943 and, therefore, are not entitled to make the deductions claimed. The original determination of deficiency against petitioner Mildred C. Gwinn, in Docket No. 25044, contained a mathematical error and was superseded by a corrected statutory notice of deficiency which is the basis of the deficiency involved in Docket No. 25045; likewise as to petitioner Joseph M. Gwinn, Jr., the original notice of deficiency, set up in Docket No. 25043, contained a mathematical error and a corrected copy of the statutory notice was therefore issued. It is the basis of the deficiency set forth in Docket No. 25042. Therefore, Decision will be entered for the petitioner Mildred C. Gwinn in Docket No. 25044 and for the petitioner Joseph M. Gwinn, Jr., in Docket No. 25043; and for lack of proof decision will be entered for the respondent in Docket No. 25042, petitioner Joseph M. Gwinn, Jr., and in Docket No. 25045, petitioner Mildred C. Gwinn. Footnotes
*. Joseph M. Gwinn, Jr., Docket Nos. 25042 and 25043. Mildred C. Gwinn, Docket Nos. 25044 and 25045.↩